1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8   FEMSPEC, L.L.C.,                         No. C-06-2719 JCS

9              Plaintiff,                    **ORDER GRANTING DEFENDANT'S
                                             MOTION TO DISMISS OR IN THE**
10      v.                                   **ALTERNATIVE FOR SUMMARY
                                             JUDGMENT AND DENYING PLAINTIFF'S**
11  JONATHAN W. DUDAS,                       **MOTION FOR SUMMARY JUDGMENT
                                             [Docket Nos. 14, 26]**
12             Defendant.
    _____/

13

14  **I.    INTRODUCTION**

15         Plaintiff Femspec L.L.C. ("Femspec") seeks judicial review of a final agency action, namely,

16  the decision of the Patent and Trademark Office denying Femspec's petition under 37 C.F.R.

17  § 1.378(b) to accept delayed payment of the maintenance fee for U.S. Patent No. 5,743,852 ("the

18  '852 patent") and reinstate that patent.  Defendant (hereinafter, "the PTO") filed a Motion to

19  Dismiss, or in the Alternative, for Summary Judgment ("Defendant's Motion"), asking the Court to

20  affirm the PTO's decision.  Plaintiff, in turn, brought a motion ("Plaintiff's Motion") asking the

21  Court to reverse that decision.  A hearing on the motions was held on January 19, 2007, at 11:00

22  a.m.  For the reasons stated below, Defendant's Motion is GRANTED and Plaintiff's Motion is

23  DENIED.[1]

24

25

26        [1]After Defendant's Motion was filed, the parties stipulated that their submissions in support of
    the motions would constitute their trial submissions and agreed that the Court would conduct a trial on
27  the papers.  Having carefully reviewed the parties' submissions and considered their legal arguments,
    the Court concludes that the issues raised are more appropriately addressed under the summary
28  judgment standard, as discussed further below.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II.    BACKGROUND[2]

### A.    Issuance of the '852 patent and Assignment to Femspec

On April 15, 1996, William T.M. Johnson ("Dr. Johnson") filed the patent application that ultimately led to the issuance of the '852 patent.  MFN Re: Administrative Records Supporting Defendant's Motion to Dismiss or in the Alternative for Summary Judgment ("AR"), PTO00002 ('852 patent).  Although Dr. Johnson was originally represented in the patent prosecution by attorney Kevin Goldstein, on October 28, 1996, he terminated his relationship with Goldstein, informing Goldstein that he was unhappy with his representation and that he intended to proceed with the application on his own.  PTO00037-00038.

On November 6, 1997, Dr. Johnson wrote to the PTO asking why his patent had not yet issued.  PTO00041.  He stated that he had terminal cancer and hoped to receive the patent before he died.  *Id*.  He instructed the PTO to send the patent, when it issued, to his son, Scott Johnson, "whether [he was] alive or dead." *Id*.  The address he provided for Scott Johnson was 4815 Nature's Waye, Blacksburg, VA 24060.  *Id*.  The patent issued on April 28, 1998.  PTO0002.  It was sent to Scott Johnson at the above address.  PTO00031 (Declaration of Scott W. Johnson).  According to Scott Johnson, he "does not recall reviewing the Patent when [he] received it, but instead promptly forwarded it to [his] father." *Id*.

On September 24, 1998, Dr. Johnson executed his Last Will and Testament ("Will").  PTO00043-00044.  Dr. Johnson included the following provision in his Will regarding the '852 patent:

> I have received U.S. Patent 5,743,852 for an inflatable speculum for the pelvic examination, issued April 28, 1998.  I direct that my Executor, Scott W. Johnson, Ph.D., should receive, hold and control this patent and all patents, copyrights, awards from lawsuits, and bank accounts which are in my name. . . .

---

[2]  Because this action involves review of agency action under 5 U.S.C. § 706(2)(A), the Court's determination is based on review of the administrative record.  Although a court may, under limited circumstances, consider evidence outside of the administrative record in such actions, *see Rydeen v. Quigg*, 748 F. Supp. 900, 903-904 (D.D.C. 1990), the parties here do not seek to introduce any such evidence.  Accordingly, the Court relies exclusively upon the administrative record in this "Background" section.

PTO00043. The Will did not specifically mention payment of fees associated with maintenance of the patent. *Id.* On December 16, 1998, Dr. Johnson committed suicide. PTO00025. Pursuant to the Will, Scott Johnson was appointed Executor of his father's estate. PTO00048.

In February 2000, Scott Johnson provided an informal accounting of the estate. PTO00099-00100. The accounting lists the value of the '852 patent as "0." PTO00099. It also reflects that the estate had no liquidity and that a deficit in the accounting was made up by Scott Johnson. PTO00100.

By July 2000, Scott Johnson had moved from the Nature's Waye address and any forwarding would have expired. PTO00034. By October 2001, Dr. Johnson's wife had sold the house she and Dr. Johnson had lived in and had moved away without leaving a forwarding address. PTO00034-00035. On June 25, 2002, the '852 patent expired due to failure to pay maintenance fees required under 37 C.F.R. §1.362.[3]  PTO00057-00058.

In June 2004, counsel for Femspec, a "medical device start-up company" located in San Francisco, discovered the '852 patent while researching prior art in connection with a proposed Femspec patent application. PTO00049-00050 (Declaration of Nicola A. Pisano). Femspec decided to try to acquire the rights under the '852 patent. *Id.* Accordingly, its counsel, Nicola Pisano, began to search for Dr. Johnson's heirs. In July 2004, Pisano located Scott Johnson and spoke to him regarding the possibility of acquiring the rights to the '852 patent. PTO00052. On August 5, 2004, Scott Johnson assigned the rights under the '852 patent to Femspec. PTO00119.

---

[3]  Pursuant to 37 C.F.R. § 1.362, in order to maintain the '852 patent in force, the patentee was required to pay a 3 ½ year maintenance fee. Under 37 C.F.R. §1.362, the maintenance fee may be paid as early as three years from the date of issuance up to 3 ½   years from the date of issuance, with an additional six month grace period, during which time a surcharge applies. Thus, the maintenance fee on the '852 patent was due no later than April 28, 2002.

**United States District Court**
For the Northern District of California

1

**B.      Petition to Accept Late Payment**

2      On August 18, 2004, Femspec filed with the PTO a Petition under 37 C.F.R. § 1.378(b) to

3 Accept Late Payment of Maintenance Fee and to Reinstate Patent.[4]  In the petition, Femspec argued

4 that the delay in payment of the maintenance fee was unavoidable under 35 U.S.C. § 41(c)(1),[5] citing

5 evidence that both Scott Johnson and his father had exercised reasonable care in connection with the

6 '852 patent.  PTO 00024-00028.  With respect to Dr. Johnson, Femspec cited evidence that although

7

8      [4] 37 C.F.R. § 1.378 provides, in relevant part, as follows:

9 (a) The Director may accept the payment of any maintenance fee due on a patent after expiration of the
patent if, upon petition, the delay in payment of the maintenance fee is shown to the satisfaction of the
10 Director to have been unavoidable (paragraph (b) of this section) or unintentional (paragraph (c) of this
section) and if the surcharge required by § 1.20(i) is paid as a condition of accepting payment of the
11 maintenance fee.  If the Director accepts payment of the maintenance fee upon petition, the patent shall
be considered as not having expired, but will be subject to the conditions set forth in 35 U.S.C.
12 § 41(c)(2).

13 (b) Any petition to accept an unavoidably delayed payment of the maintenance fee filed under paragraph

14 (a) of this section must include:

15 (1) The required maintenance fee set forth in § 1.20(e) through (g);

16 (2) The surcharge set forth in § 1.20(I)(1); and

17 (3) A showing that the delay was unavoidable since reasonable care was taken to ensure that the
maintenance fee would be paid timely and that the petition was filed promptly after the patentee was
18 notified of, or otherwise became aware of, the expiration of the patent.  The showing must enumerate
the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which the
19 patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly.

20 (c) Any petition to accept an unintentionally delayed payment of a maintenance fee filed under
paragraph
21
(a) of this section must be filed within twenty-four months after the six-month grace period provided
22 in § 1.362(e) and must include:

23 (1) The required maintenance fee set forth in § 1.20(e) through (g);

24 (2) The surcharge set forth in § 1.20(I)(2); and

25 (3) A statement that the delay in payment of the maintenance fee was unintentional.

26      [5] 35 U.S.C. § 41(c)(1) provides, in relevant part, that "[t]he Director may accept the payment
of any maintenance fee required by subsection (b) of this section which is made within twenty-four
27 months after the six-month grace period if the delay is shown to the satisfaction of the Director to have
been unintentional, or at any time after the six month grace period if the delay is shown to the
28 satisfaction of the Director to have been unavoidable. . . .

**United States District Court**
For the Northern District of California

1   Dr. Johnson had been a "meticulous individual," he had been struggling with terminal cancer and

2   was prosecuting the patent application pro se.  PTO00024-00025.  As a result, he did not specifically

3   provide for payment of maintenance fees in his will, even though he included a provision addressing

4   the '852 patent.  PTO00025.  Femspec noted that while Dr. Johnson "may have calendared a date for

5   payment of the maintenance fee . . . any such notation may have gone unrecognized . . . [b]ecause

6   [Scott Johnson] lacked experience with patents."  *Id*.  Further, "[m]any of [Dr. Johnson's] business

7   records were discarded during and after administration of his estate."  *Id*.

8        Femspec also cited evidence that Scott Johnson had exercised reasonable care, but

9   nonetheless was unaware of the need to pay a maintenance fee on the '852 patent.  Femspec pointed

10  out that Scott Johnson was unfamiliar with patent law and did not receive any notices that may have

11  been sent by the PTO because both he and his father's widow had moved.  PTO000227.  It also

12  noted that because Scott Johnson had a copy of the patent made by his father that did not include the

13  notice of maintenance fees that is on the inside cover of the original grant, he was unaware of any

14  need to look for the original grant and apparently did not do so.  *Id*.

15       The PTO rejected the petition on September 17, 2004, on the basis that Femspec had not

16  made an adequate showing of unavoidable delay.  In its decision, the PTO stated that to establish

17  unavoidable delay, Petitioner was required to show that:

18          the party obligated to make the maintenance fee payment 1) knew of
            the need to make the maintenance fee payment, 2) implemented a
19          reliable docketing system to track the relevant dates 3) treated
            payment of the maintenance fee (and later filing of a petition to
20          reinstate) as his most important business, 4) was prevented from
            making the payment and 5) must show that the entire delay in making
21          the payment was unavoidable.

22  PTO00090.  Because Scott Johnson was the party responsible for making the payment, the PTO

23  looked to his actions to determine if the requirements listed above were met.  *Id*.  The PTO held that

24  the delay was not unavoidable because there was "no system in place to ensure payment of the

25  maintenance fee" and  Scott Johnson's lack of knowledge of the fee was not unavoidable delay.

26  PTO00091.  According to the PTO, Johnson "might have consulted with someone who was [familiar

27  with patent law] or contacted the Patent and Trademark Office."  PTO00092.

28

United States District Court
For the Northern District of California

1    Femspec requested reconsideration of the decision.  It argued that the cases relied upon by

2    the PTO involved failure to pay maintenance fees by attorneys, not ordinary individuals like Scott

3    Johnson.  PTO00106-000113.  Femspec also challenged the PTO's assertion that Scott Johnson

4    should have consulted with a patent attorney.  PTO00114.  Femspec asserted that to retain a patent

5    attorney when there was no indication that there were any commercial prospects for developing the

6    technology in the '852 would have exposed Scott Johnson to potential liability for waste of estate

7    assets, especially as the estate had no liquidity and assets would have had to have been liquidated to

8    retain such counsel.  PTO00114-00117.  In support of this position, Femspec offered an opinion by

9    estates and trusts lawyer Stephen Carroll stating his belief that under the circumstances, Scott

10   Johnson had exercised reasonable care under Pennsylvania law in handling his father's estate,

11   including the '852 patent.  *Id*.

12       The PTO again rejected Femspec's position, issuing its final decision on February 23, 2006.

13   The PTO held that the principle that lack of knowledge does not constitute unavoidable delay is not

14   limited to patent attorneys.  PTO00133.  The PTO rejected Femspec's reliance on the opinion of

15   Stephen Carroll, noting that federal patent law rather than state probate law governs determinations

16   regarding the reinstatement of a patent.  PTO00135.

17   **C.     The Motions**

18       In Defendant's Motion, the PTO reiterates the position it took in its February 23, 2006

19   decision, namely, that the unavoidable delay standard does not apply exclusively to patent attorneys

20   and that Femspec has not made an adequate showing to meet that standard.  The PTO also points out

21   that this Court's review is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701

22   et seq.  Under the APA, the scope of review is "narrow" and "a court is not to substitute its judgment

23   for that of the agency."  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

24   463 U.S. 29, 43 (1983).  Femspec does not challenge this standard but argues that the decision of the

25   PTO should be reversed nonetheless on the basis that it is "contrary to established law."  Femspec

26   also asserts that the PTO's position is inconsistent with legislative intent, pointing to a 1992

27   amendment of the underlying statutory provision at issue, 5 U.S.C. § 41(c), to ameliorate the harsh

28   results of the "unavoidable delay" standard as applied to those whose patents have lapsed within the

6

United States District Court

For the Northern District of California

1   last 24 months.  Finally, Femspec argues that the PTO has elevated the reasonably prudent person

2   standard to a level beyond reason by holding that in order to satisfy it, an individual would have to

3   engage in conduct inconsistent with his obligations under state law as executor of an estate, resulting

4   in an arbitrary and capricious application of the law.

5   **III.    ANALYSIS**

6       **A.    Legal Standard**

7       Femspec asks the Court to set aside the PTO's action under 5 U.S.C. § 706(2)(A) on the

8   basis that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

9   law."  "In applying that standard, the focal point for judicial review should be the administrative

10  record already in existence, not some new record made initially in the reviewing court."  *Camp v.*

11  *Pitts*, 411 U.S. 138, 142 (1973).[6]  The Supreme Court has described the scope of review under this

12  standard as follows:

> The scope of review under the "arbitrary and capricious" standard is
> narrow and a court is not to substitute its judgment for that of the
> agency. . . .  Normally, an agency rule would be arbitrary and
> capricious if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important aspect
> of the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so implausible that it
> could not be ascribed to a difference in view or the product of agency
> expertise. . . .

18  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto Ins. Co.*,  463 U.S. 29, 43 (1983);

19  *see also MMTC, Inc. v. Rogan*, 369 F.Supp. 2d 675, 678 (E.D. Va. 2004) (noting that in applying the

20  standard set forth in 5 U.S.C. § 706(2)(A) to review of a PTO decision under 35 U.S.C. § 41(c)(1)

21  regarding unavoidable delay, the court must "consider whether the decision was based on a

22  consideration of the relevant factors and whether there has been a clear error of judgment") (citing

23  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416(1971)).

24      "[T]he question of whether an applicant's delay . . . was unavoidable must be decided on a

25  case-by-case basis, taking all of the facts and circumstances into account." *Smith v. Mossinghoff*, 671

26  _____

27      [6] Although under limited circumstances a reviewing court acting under the APA may conduct
    de novo review of the facts, *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971),
28  the parties do not request such de novo review.

United States District Court

For the Northern District of California

F.2d 533, 537 (D.C. Cir. 1982).  Because the parties rely on the administrative record, the content of which is not disputed, the Court treats their motions as motions for summary judgment.  *See id.* (holding that district court erred in characterizing motion by PTO as motion to dismiss where motion was supported by evidence from the administrative record and the district court's ruling was, in effect, a summary judgment order); *see also R.R. Donnelly & Sons Co. v. Dickinson*, 123 F. Supp. 2d 456, 458 (N.D. Il. 2000) (holding that "where, as here, summary judgment is based on an administrative record, there can be no genuine issue of material fact regarding the content of the record").

### B.    Discussion

Femspec asserts that the PTO's decision must be set aside because its application of the reasonably prudent person standard is arbitrary and capricious.  In support of this position, Femspec cites: 1) federal case law addressing the unavoidable delay standard; 2) the legislative history associated with 35 U.S. § 41, the provision in which the unavoidable delay standard is codified; and 3) Pennsylvania case law governing the obligations of executors.  The Court concludes that although a close call, Femspec has not established that the PTO's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### 1.    Federal Case Law

The "unavoidable delay" standard set forth in 35 U.S.C. § 41(c)(1) (quoted above) "has remained unchanged since first enacted in 1861."  *Mossinghoff*, 671 F.2d at 538.  As noted by the court in *Mossinghoff*, "[t]here is a dearth of legislative history that might provide some clue to the meaning intended by Congress . . . for the word 'unavoidable' [and cases] in point are few."  *Id*. Courts have held that "in determining whether a delay in paying a maintenance fee was unavoidable, one looks to whether the party responsible for payment of the maintenance fee exercised the due care of a reasonably prudent person."  *Ray v. Lehman*, 55 F.3d 606,609 (Fed. Cir. 1995).  This standard is sometimes difficult to apply, however, when the responsible party was not aware of the requirement that a maintenance fee be paid in the first instance.

The regulation used by the PTO to determine whether delay was "unavoidable" does not directly address situations in which failure to pay the maintenance fee results from ignorance of the

United States District Court

For the Northern District of California

1   requirement to do so.  *See* 37 C.F.R. § 1.378.  It requires that a petitioner "enumerate the steps taken

2   to ensure timely payment of the maintenance fee," suggesting that a patent owner who fails to take

3   such steps due to ignorance could *never* establish unavoidable delay.  However, in the seminal case

4   of *In re Mattullath*, 38 App.D.C. 497 (D.C. Cir. 1912), a case on which the PTO relied in its

5   February 23, 2006 decision, it was established that there *are* situations in which ignorance of the

6   requirement to pay maintenance fees may support a finding of unavoidable delay.  Femspec relies

7   heavily on *In re Mattullath* in support of its motion, arguing that the facts of that case are similar to

8   those in this case.

9           In *In re Mattullath*, the court addressed whether a patent application that had been considered

10  abandoned could be revived on the basis of unavoidable delay seven years later.[7]  *Id*. at 502.  There,

11  the petitioner was a widow, Meta Mattullath, whose husband had applied for a patent for a flying

12  machine in 1900 with the assistance of his attorneys, the firm of Barthel & Barthel.  *Id*. at 499-500.

13  In 1902, before the patent had issued, the applicant died.  *Id*. at 501.  He "left no property

14  whatsoever, and . . . the family was without means."  *Id*. at 512.  According to affidavits submitted

15  in support of the petition to revive, when around the time or the applicant's death Barthel & Barthel

16  filed formal amendments attempting to respond to the Commissioner's most recent objections, the

17  PTO notified them that their power of attorney had been terminated by virtue of the applicant's

18  death and Barthel & Barthel ceased prosecuting the application.  *Id*.  Neither the PTO nor Barthel &

19  Barthel notified Mattullath's widow of the pending application.  *Id*. at 512.  On October 3, 1903, the

20  PTO entered the application on its records as abandoned.  *Id*. at 502.

21          On November 23, 1910, Meta Mattullath filed a petition to revive the application with the

22  PTO.  *Id*. at 502. She alleged that she was the duly appointed administratrix of her husband's estate

23  and that while she and her family knew her husband had been working on a flying invention, none of

24  them knew that he had applied for a patent.  *Id*.  Although she had, upon the advice of an attorney

---

26

27          [7]  A patent application that has been considered abandoned for failure to prosecute may be
    revived upon a showing of "unavoidable delay."  35 U.S.C. § 133.  Courts have held that that standard
    is the same as the "unavoidable delay" standard that is applied in connection with a petition to reinstate

28  under 35 U.S.C. § 41(c).  *See Ray v. Lehman*, 55 F.3d 606, 609 (Fed. Cir. 1995).

**United States District Court**
For the Northern District of California

1  friend, inquired in letters to a number of her husband's associates whether they knew of any patents

2  held by her husband, none informed her of the application.  *Id.* at 507.  She did not make inquiries

3  with the PTO.  *Id.*  It was not until October 1909, when she received a request from an attorney for

4  authorization permitting him to review the file, that Meta Mattullath learned of the patent

5  application.  *Id.* at 502.  At that point, she found a "charitable attorney" who agreed to file a petition

6  to revive the application.  *Id.* at 513.  She was unable to pay the attorney's fees, but advanced to him

7  $41 in costs.  *Id.*  Before he had filed the petition to revive, however, the attorney died of

8  tuberculosis, resulting in the loss of some of the papers and further delay of over a year, when the

9  petition to revive was finally filed.  *Id.*

10      In the petition, evidence was presented that Meta Mattullath's husband had been extremely

11  secretive about the patent application.  *Id.* at 506.  The Barthel & Barthel attorneys verified that they

12  had not informed Meta Mattullath of the patent application, stating that they did not know her

13  address or whereabouts.  *Id.*  Meta Mattullath stated that had she been informed by Barthel &

14  Barthel of the revocation of their power of attorney, she would have had them continue to prosecute

15  the patent on behalf of her husband's estate.  *Id.* at 503.

16      The PTO rejected the request to revive the application, finding that Meta Mattullath had not

17  demonstrated unavoidable delay.  *Id.* at 505.  The court, however, reversed, concluding that the

18  petitioner had not "slept upon her rights."  *Id.* at 511.  In reaching this conclusion, the court pointed

19  first and foremost to the PTO's action of revoking Barthel & Barthel's power of attorney due to the

20  original applicant's death.  *Id.*  The court held that the applicant's death had not revoked Barthel &

21  Barthel's power of attorney and described the Commissioner's act as "inexplicable."  *Id.*  The court

22  opined:

23          it would have been eminently proper to notify [Barthel & Barthel] of
            the death of their client, and suggest the propriety of obtaining a
24          renewal from his legal representatives, meanwhile suspending action
            for a reasonable time for the purpose.  Had this been done, the
25          solicitors would have been under obligation to inquire for, and notify
            the intestate's representatives of the situation.

26

27  *Id.*

28

United States District Court
For the Northern District of California

1   The court went on to reject the contention that "notice to the solicitors was the equivalent of

2   notice to the representatives; and that their negligence is to be imputed to petitioner." *Id*. at 512.

3   The court held that "[t]heir negligence in conducting the proceedings, while the relation of client and

4   attorney continued to be recognized [by the PTO], could be imputed to the applicant.  But it is

5   unreasonable that their neglect was the neglect of the petitioner, when the [PTO] had declared their

6   authority ended."  *Id*. at 512.  Further, the court noted, "they were never the attorneys of the

7   deceased applicant's representatives."  *Id*.

8   In addition, the court concluded that Meta Mattullath had acted with "diligence and good

9   faith" even though she had not made any inquiry with the PTO.  *Id*. at 512-513.  The court stated,

10  Without pausing to consider the many exceptions to the rule that
11  ignorance or mistake of law excuses no one, it is sufficient to say that
    there is no just foundation for the application of the general rule in this
12  case.  There is no statutory or other rule of law requiring parties to
    apply for information at the Office.  It is a fact that information
13  concerning applications for patents will be furnished to the applicant
    or his legal representatives.  It is not at all wonderful that a woman
14  like the petitioner should have been ignorant of this fact, especially as
    it seems not to have been known to the lawyer who advised her where
15  to seek information.  Nor is it at all remarkable that she should not
    have known, in making her inquiries, that there was an essential
16  difference between an application and a patent.  It plainly appears
    from her sworn statements that she did not know the difference, or that
17  she could obtain information of the application by applying to the
    Office.  It was ignorance of a fact, not of law.

18  *Id*. at 513-514.

19  Finally, the court addressed the intent of Congress in using the word "unavoidable."  *Id* at

20  514-515.  Rejecting the position of the Commissioner as "technical, hard, and narrow," the court

21  instead adopted an interpretation that was "broad and liberal, breathing the spirit of equity, and more

22  in accord with our patent laws."  *Id* at 515.  That interpretation is embodied in the opinion of a

23  former Commissioner, quoted by the court at length:

24  The word "unavoidable" . . . is one of very broad significance.  In its
    application to many relations it would exclude everything but the
25  "King's enemies" or acts of God.  I do not believe such a construction
    would be a fair interpretation of the statute.  The statute is one
26  regulating a mere practice in the Office, and is not intended to affect
    substantial rights as between different persons or between persons and
27  the government.  It is rather a provision by which a statutory limitation
    may be removed.  Its purpose is to encourage diligence in proceedings
28  before the Office.  If the broad and unlimited meaning of the word

11

1
2
3
4
5
6
7
"unavoidable" were to prevail, it is difficult to conceive when an abandoned case could be reinstated under this section. In my opinion, the word is used in a more limited sense. It is applicable to ordinary human affairs, and requires no more or greater care or diligence than is generally used and observed by prudent and careful men in relation to their most important business. It permits them, in the exercise of this care, to rely upon the ordinary and trustworthy agencies of mail and telegraph, worthy and reliable employees, and such others means and instrumentalities as are usually employed in such important business. If unexpectedly, or through unforeseen fault or imperfection of these agencies and instrumentalities, there occurs a failure, it may properly be said to be unavoidable, all the other conditions of good faith and promptness in its ratification being present.

8    *Id*. at 514-515 (citation omitted).

9       While Femspec relies heavily on *In re Mattullath*, the PTO argues that case is distinguishable

10   and cites instead cases in which courts have found that ignorance did not support a finding of

11   unavoidable delay. *See Ray v. Lehman*, 55 F.3d 606 (Fed. Cir. 1995)(discussed below); *Smith v.*

12   *Mossinghoff*, 671 F. 2d 533 (D.C. Cir. 1982) (holding that where applicant's attorney missed

13   deadline because he was preoccupied with other legal matters and was in the process of moving his

14   residence, applicant did not establish unavoidable delay); *Rydeen v. Quigg*, 748 F. Supp. 900

15   (D.D.C. 1990) (holding that failure to pay maintenance fee because patentee's attorney had not

16   received customary notice from PTO alerting him it was due was not sufficient to establish

17   unavoidable delay because PTO has no duty to provide notice that maintenance fee is due).

18       The PTO asserts that *Ray v. Lehman*, 55 F.3d 606 (Fed. Cir. 1995) establishes that ignorance

19   of the maintenance fee requirement on the part of a patentee does not constitute unavoidable delay –

20   even when the patentee is not represented by counsel. In *Ray*, the applicant (Ray) was represented

21   in prosecuting the patent by a patent agent, Tom Sherrard. 55 F. 3d at 607. The patent issued in

22   August 1984, and Sherrard listed his own address for receipt of further correspondence from the

23   PTO. *Id*. Subsequently, the PTO sent Sherrard a notice regarding the requirement that a

24   maintenance fee be paid on the patent. *Id*. Because Sherrard had, by this time, retired, he forwarded

25   the notice to his former client's last known address. *Id*. The letter was returned to Sherrard as

26   undeliverable and Sherrard took no further action. *Id*. In 1990, Ray discovered that the patent had

27   expired and attempted to have it reinstated. *Id*. He stated that Sherrard had never told him about the

28   maintenance fee requirement and that he knew of no reason to keep in contact with Sherrard after his

United States District Court

For the Northern District of California

1  retirement.  *Id*.  The PTO held that Ray had not established unavoidable delay, and the court

2  affirmed.  The court held that Ray had not shown that he acted as a reasonably prudent person,

3  noting that Ray did not provide a current address to either the PTO or Sherrard.  *Id*. at 610.

4        Comparing the facts of *In re Mattullah* to those in *Ray*, the Court concludes that the latter is

5  the more closely on point of the two decisions.  Here, as in *Ray*, the responsible party was a non-

6  attorney who was entirely unaware of the obligation to pay maintenance fees.  Further, in this case,

7  as in *Ray*, it is evident that Scott Johnson's ignorance was understandable under the circumstances

8  and that his failure to pay the required maintenance fee was unintentional.  Yet the court in *Ray*

9  made clear that this is not enough to meet the stringent standard of "unavoidable delay."  In order to

10  meet that standard, Scott Johnson would have had to establish that he made an effort to inform

11  himself of the legal obligations associated with owning a patent.  *See California Med. Prods. v.*

12  *Tecnol Med.*, 921 F. Supp. 1219 (D. Del. 1995) (noting that "if [the patent attorney] had ceased

13  representing [the patent holder] for some reason, the patent holder would have been obligated at that

14  time to either familiarize himself with the maintenance fee requirements or retain new counsel . . .").

15  He did not demonstrate that he made such an effort.  In fact, like the patentee in *Ray*, he did not even

16  provide a current address to the PTO.

17        The facts in *In re Mattullah* are distinguishable from those in this case.  There, the petitioner

18  was ignorant even that a patent application had been filed – a question of fact.  In contrast, the

19  responsible party here was aware of the existence of the patent but did not make efforts to learn

20  about the *legal* requirements that ownership entailed.  In addition, Mattullah documented her

21  attempts to learn whether her husband had left anything of value through inquiries to friends and

22  associates of her husband.  The court found these efforts satisfied the requirement that she act as a

23  reasonably prudent person.  Here, Femspec presented *no* evidence that Scott Johnson sought to

24  inform himself about the obligations associated with patent ownership.  Under these circumstances,

25  the Court cannot find that the PTO acted contrary to law or abused its discretion in concluding that

26  the unavoidable delay standard was not met.

27

28

United States District Court

For the Northern District of California

### 2.      Legislative History

Femspec also points in support of its position to the legislative history associated with amendments to 35 U.S.C. § 41(c), arguing that Congress intended to loosen the "unavoidable delay" standard because its results were found to be too harsh.  The Court does not agree.

Maintenance fees were first introduced into federal patent law in 1980, when 35 U.S.C. § 41 was adopted.  *Laerdal Med. v. Ambu, Inc.*, 877 F. Supp. 255, 256 (D.Md. 1995).  In 1982, Congress amended this provision to allow the Commissioner to accept payment after the six month grace period where the delay was "unavoidable."  *Id*.  As noted above, this is the same standard that has been used for over a hundred years with respect to revival of patent applications considered abandoned.  In the legislative record, the justification for the 1982 amendment was to "avoid an inequitable loss of patent rights."  *Id*.  (citing H.R.Rep. No. 542 at 3, 1982 U.S.C.C.A.N. at 767).

In 1992, Congress amended 35 U.S.C. § 41 again, introducing a lower standard for reinstatement of patents within 24 months after expiration of the six-month grace period.  Under the amended provision, a patent could be reinstated during this period where the failure to pay a maintenance fee was "unintentional."  Congress explained its actions as follows:

> The "unavoidable" standard has proved to be too stringent in many cases.  Many patentees have been deprived of their patent rights for failure to pay the maintenance fees for reasons that may have been unintentional yet not unavoidable.
>
> Under the amendment in the nature of a substitute as adopted by the Committee, patent owners still will have the six month grace period to pay the maintenance fees without any adverse consequences.  The new unintentional standard would be applicable for a twenty-four month period after the six month grace period. After the expiration of the six month grace period, the Commissioner of the Patent and Trademark Office can accept late payments for twenty-four additional months after the six month grace period if the delay in payment was either unintentional or unavoidable.  After the expiration of the twenty-four months, the Commissioner can accept late payments of maintenance fees only if the delay was unavoidable.

*Id*. (quoting H.R.Rep. No. 993, 102nd Cong., 2d Sess., 2 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1623, 1623-24).

The Court does not find that this legislative history reflects an intent on the part of Congress to relax the "unavoidable delay" standard with the 1992 amendment.  Rather, Congress loosened the

**United States District Court**
For the Northern District of California

1   requirements for reinstatement by introducing a new, lower standard ("unintentional delay") *only* for

2   delays within a 24-month period following expiration of the grace period.  Congress expressly

3   retained the "unavoidable delay" standard – even with its sometimes harsh results – for petitions

4   brought after the 24-month period.

5                    **3.        Pennsylvania Law**

6          Femspec argues that the PTO's decision in this case elevates the standard for a reasonably

7   prudent person to an unreasonably high level because it requires an executor to take actions that are

8   inconsistent with his duties under state law as an executor.  In particular, it points to the rule under

9   Pennsylvania law that "[a]n executor's duty is to take custody of the estate and to administer it so as

10  to preserve and protect the property for distribution to the proper persons within a reasonable time."

11  *Matter of Estate of Campbell*, 692 A.2d 1098, 1101-1102 (Pa. Super. 1997).  According to attorney

12  Carroll, in light of the lack of liquidity of the estate and apparent lack of commercial opportunities,

13  Scott Johnson's failure to retain a patent attorney to ascertain the value of the '852 patent was

14  consistent with this duty.

15         While the "unavoidable delay" standard is unquestionably a stringent one and may require an

16  executor to make difficult choices, the Court is not persuaded that under the facts of this case the

17  PTO's decision is contrary to law or arbitrary and capricious.  Under federal law, a patentee has a

18  duty to "familiarize himself" with the legal requirements associated with holding a patent. *California*

19  *Med. Prods. v. Tecnol Med.*, 921 F. Supp. 1219, 1259 (D. Del. 1995).  Even assuming that it would

20  have been improper under Pennsylvania law for Scott Johnson to retain a patent attorney to

21  determine the value of the '852 patent, there are other steps short of retaining a patent attorney he

22  could have taken that might have alerted him to the need to pay the maintenance fee.  The most basic

23  of these would have been to try to find the original grant.  He might also have provided the PTO

24  with a current address.  Or, he might have visited a local library or searched on-line to inform

25  himself of the legal requirements imposed on patentees.  Yet there is no showing that Scott Johnson

26  took any of these steps.  Accordingly, the Court concludes that the PTO's action was not arbitrary,

27  capricious or contrary to law.

28

**IV.    CONCLUSION**

        For the reasons stated above, the Court GRANTS Defendant's Motion for summary

judgment, DENIES Plaintiff's motion for summary judgement and affirms the decision of the PTO.

IT IS SO ORDERED.


DATE:  January 26, 2007

                                                        _____
                                                        JOSEPH C. SPERO
                                                        United States Magistrate Judge

**United States District Court**
For the Northern District of California

16